MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2017 ME 108
Docket:        Ken-16-257
Submitted
  On Briefs:   April 27, 2017
Decided:       June 1, 2017

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

JOSHUA T. WILLIAMSON

ALEXANDER, J.

[¶1]   This appeal involves a defendant who, while showing signs of significant impairment, accurately predicted to police officers that he would test at a "point 22," nearly three times the .08 limit established by law. *See* 29-A M.R.S. § 2411(1-A)(A)(2) (2016).   A jury found him guilty of operating under the influence at a trial where the State had to prove either that Williamson's quantitative breath-alcohol level exceeded that limit or that his mental or physical faculties were impaired however slightly, or to any extent, by alcohol, drugs, or other intoxicants that he had consumed.   *See* *State v. Atkins*, 2015 ME 162, ¶¶ 1, 21, 129 A.3d 952.   On appeal, the defendant's primary contention is that the State failed to comply with

technical requirements for the admission of the Intoxilyzer test result. We affirm the judgment.

[¶2] Joshua T. Williamson appeals from a judgment of conviction entered by the trial court (Kennebec County, *Marden, J.*) after a jury found him guilty of operating under the influence (Class D), 29-A M.R.S. § 2411(1-A)(B)(1) (2016), and criminal mischief (Class D), 17-A M.R.S. § 806(1)(A) (2016). Williamson argues that the trial court abused its discretion by admitting the breath test result pursuant to 29-A M.R.S. § 2431(2) (2016) and that the State's late disclosure that one of its witnesses was recently investigated for accidentally shooting himself violated his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

## I. CASE HISTORY

[¶3] "Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt." *State v. Rourke*, 2017 ME 10, ¶ 2, 154 A.3d 127.

[¶4] On August 11, 2015, Williamson arrived at his Gardiner home from work between 3:00 and 4:00 p.m. and began smoking marijuana and drinking shots of vodka. Williamson's girlfriend arrived home at approximately 5:30 p.m. Her Ford Explorer and Jeep Grand Cherokee were parked in front of

the apartment building in which they lived. She and Williamson had been arguing all day, and she observed him drink vodka straight from the bottle.[1]

[¶5] At some point, Williamson left to visit a neighbor in the adjacent apartment. The neighbor knocked on Williamson's door later that evening and asked Williamson's girlfriend to retrieve Williamson from the neighbor's apartment. Williamson and his girlfriend resumed arguing. He took the keys to her Jeep Grand Cherokee and drove her Jeep into her Ford Explorer, backed up, and drove the Jeep into the Ford again. The neighbor, upon hearing the crash, went outside and observed damage to the vehicles parked outside of the apartment building. The Jeep had a flat tire, and the Ford had a broken taillight.

[¶6] Approximately twenty minutes later, at 1:54 a.m., Williamson called 9-1-1 to report a domestic dispute. The dispatcher determined, after speaking with Williamson, that his speech was slurred and that he had difficulty answering "straightforward" questions.

---

[1] Williamson's girlfriend provided conflicting testimony at trial regarding when she observed Williamson drink alcohol. On direct examination, she testified that Williamson did *not* drink anything *after* he damaged her vehicles, but, on cross-examination, she testified that he *began* drinking *after* he damaged her vehicles. Williamson's girlfriend also testified to a version of the timing of events that was different from the version that she provided in her written statement to police immediately after the incident, which statement the State used to impeach her testimony.

4

[¶7] Officers of the Gardiner Police Department arrived approximately ten minutes after Williamson called 9-1-1. They observed that Williamson was unsteady on his feet, stumbling over objects, slurring his speech, and exhibiting erratic behavior. He admitted that he had been drinking alcohol since getting home from work hours earlier, but he denied driving. The jury also heard evidence that months later, at a Bureau of Motor Vehicles hearing held before his trial, Williamson admitted to driving and to damaging his girlfriend's vehicles.

[¶8] The police arrested Williamson and transported him to the police station, where he performed poorly on standardized field sobriety tests. Williamson agreed to take a breath test and "guesstimated" that he would test at a "point 22." An officer administered the breath test on an Intoxilyzer at 3:38 a.m., and Williamson's result was indeed 0.22 grams of alcohol per 210 liters of breath.

[¶9] In October 2015, Williamson was charged by complaint with operating under the influence (Class D), 29-A M.R.S. § 2411(1-A)(B)(1), and criminal mischief (Class D), 17-A M.R.S. § 806(1)(A). Williamson pleaded not guilty.

[¶10]  The court held a two-day jury trial in May 2016.  The State's evidence consisted of testimony of the 9-1-1 dispatcher, Williamson's neighbor, Williamson's girlfriend, the responding officers, and the Intoxilyzer site coordinator for the Gardiner Police Department, and exhibits including a recording of the 9-1-1 call, photographs of the damaged vehicles, portions of a police body camera video, and the certified Intoxilyzer result.

[¶11]  On the first day of the trial, the State informed Williamson and the court that Williamson's neighbor had recently been investigated for accidentally shooting himself in the leg, but that the State did not intend to file any charges.  Williamson objected to the neighbor's testimony.  He argued:

> I have a very detailed *Brady* discovery request that, you know, if there [were] reports that he maybe said things or hasn't made credible statements to the police or prosecutors, then I should have known about that, I mean that's potential *Brady* information . . . If he says something and his credibility is an issue, there is a *Brady* violation if they have not disclosed reports to me.

The court concluded that the investigation of the accidental shooting had no bearing on the neighbor's credibility and overruled the objection.

[¶12]  Williamson also offered to stipulate to being under the influence when the police arrived and to the Intoxilyzer result, but the stipulation was conditioned on the State not offering videos showing his impairment.  The State did not agree to the stipulation.  After the officer who administered the

6

breath test testified that the Intoxilyzer bore the stamp of approval of the Department of Health and Human Services (the Department), the State offered the breath test result. Williamson objected. He argued that, although the State had satisfied paragraph H of 29-A M.R.S. § 2431(2), it had not offered sufficient evidence to satisfy paragraph I. The court sustained the objection.

[¶13] The State then called the Intoxilyzer site coordinator, who testified that the Intoxilyzer bore the Department's stamp of approval and that he performs a monthly calibration check of the solution that is used in the operation of the Intoxilyzer, which is provided by a chemist from the Department's Health and Environmental Testing Laboratory. When asked if the solution comes with a statement of the manufacturer certifying its composition and quality, the officer testified that it does not come with a "certificate" but that it comes directly from the Department "with [the chemist's] initials."

[¶14] The State offered the result of the Intoxilyzer for a second time, and the court admitted the Intoxilyzer result over Williamson's objection. The court stated that paragraph I was satisfied by testimony that the materials "com[e] from the Department of Health and Human Services with [the chemist's] stamp," which has been "the standard in the industry" in Maine.

[¶15]   After the State rested, Williamson moved for a judgment of acquittal on the charge of operating under the influence, arguing that the State had failed to prove that Williamson was impaired at the time of operation. The court denied the motion.  The State and Williamson offered closing arguments.  Williamson's closing argument focused almost exclusively on the issue of whether he was impaired at the time of operation.[2]  The jury found Williamson guilty of both counts.[3]

[¶16]   Williamson moved for a judgment of acquittal, M.R.U. Crim. P. 29(a), which the court denied.  The court sentenced Williamson to 364 days' incarceration with all but twenty days suspended, one year of probation, a $700 fine, and fees and surcharges.[4]  Williamson timely filed this appeal. *See* 15 M.R.S. § 2115 (2016); M.R. App. P. 2.

---

[2]  Likewise, in Williamson's opening statement, he asked the jury "to focus like a laser" on the "critical piece" of the State's case which is "[Williamson's] state at the time of driving . . . [n]ot some time later in the evening, not some earlier time, but at the time of driving."

[3]  During deliberations, the jury sent a note to the court with three questions.  The questions concerned what time Williamson's girlfriend retrieved Williamson from their neighbor's apartment, the amount of time between the neighbor hearing the crash and the arrival of the police, and Williamson's girlfriend's written statement to police.

[4]  Before the start of the trial, Williamson stipulated to a prior conviction for operating under the influence that occurred on September 18, 2007, which enhanced the minimum mandatory sentence of incarceration.  *See* 29-A M.R.S. § 2411(1-A)(B)(1), (5)(B) (2016).

## II.  LEGAL ANALYSIS

A.     *Breath Test Result*

[¶17]  Williamson argues that that the trial court abused its discretion and clearly erred by admitting the Intoxilyzer result when the State failed to prove the requirements of paragraphs H and I of 29-A M.R.S. § 2431(2).  "[W]e review the admission of evidence over an objection for lack of foundation for an abuse of discretion, but review underlying factual findings for clear error." *State v. Gurney*, 2012 ME 14, ¶ 36, 36 A.3d 893.

[¶18]   Title 29-A M.R.S. § 2431 (2016) establishes evidentiary rules governing admission of breath testing results in operating under the influence cases.  *State v. Tozier*, 2015 ME 57, ¶ 7, 115 A.3d 1240.  A breath test result from an Intoxilyzer may be admitted as prima facie evidence of a criminal defendant's alcohol level.  29-A M.R.S. § 2431(2)(G).  To admit the result, the State must either produce expert testimony or present sufficient evidence to satisfy paragraphs H and I of the statute.  *Id.* § 2431(2)(K); *Tozier*, 2015 ME 57, ¶ 14, 115 A.3d 1240.  Paragraph H requires evidence that the testing apparatus was approved by the Department, which may be proved by demonstrating that the apparatus bore the Department's stamp of approval. 29-A M.R.S. § 2431(2)(H).  Paragraph I requires evidence that the materials

used in operating or checking the operation of the testing apparatus were of the composition and quality stated, which may be proved by demonstrating that the materials "bore a statement of the manufacturer or of the Department." *Id.* § 2431(2)(I). The statute does not define "statement." *See* 29-A M.R.S. § 2401 (2016).

[¶19] Here, the State met the requirements of paragraph H with the testimony of both the Intoxilyzer operator and the site coordinator that the apparatus bore the Department's stamp of approval. Williamson agreed at trial that paragraph H had been satisfied. Thus, any challenge to compliance with paragraph H was waived.

[¶20] Regarding paragraph I, the site coordinator testified that the solution used in the operation of the breath test apparatus was provided by the Department's Health and Environmental Testing Laboratory and bore the initials of a chemist employed by the Department. As the statute does not mandate that the statement of the Department take a particular form, the court did not err in construing the chemist's initials as a "statement" of the Department. Because there is competent evidence in the record to support the court's findings that the State satisfied paragraphs H and I, the court did not abuse its discretion or clearly err in admitting the test result.

B.      Late Disclosure Regarding State's Witness

[¶21]  Williamson argues that the State's disclosure, during trial, that a State's witness was recently investigated for accidentally shooting himself violated Williamson's due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83.[5]  We review the alleged due process violation de novo.  *State v. Jones*, 2012 ME 126, ¶ 35, 55 A.3d 432.

[¶22]   "A defendant's due process rights are violated when the prosecution withholds evidence favorable to him."   *State v. Jobin*, 510 A.2d 527, 529-30 (Me. 1986) (citing *Brady*, 373 U.S. at 87).  A *Brady* violation has three elements: (1) the evidence must be favorable to the defendant because it is either exculpatory or impeaching, (2) the State must have suppressed the evidence either willfully or inadvertently, and (3) prejudice must have ensued.  *State v. Twardus*, 2013 ME 74, ¶ 32, 72 A.3d 523.

[¶23]   We have held on numerous occasions that the State's late disclosure of potentially exculpatory evidence is not necessarily, on its own, a violation of due process pursuant to *Brady*.  The context and the facts

---

[5] Williamson also argues that his due process rights were violated based on M.R.U. Crim. P. 16 and "notions of fair play" pursuant to the state and federal constitutions.  These arguments were not raised before the trial court, and, therefore, we review only for obvious error.  *See* M.R.U. Crim. P. 52(b); *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147.  We conclude that there was no obvious error.

surrounding the late disclosure are critical to the analysis. *See State v. Gagne*, 2017 ME 63, ¶¶ 29-30, --- A.3d --- (concluding that the State's production of medical records a week before trial did not deprive the defendant of a fair trial); *State v. Gould*, 2012 ME 60, ¶¶ 7, 25-26, 43 A.3d 952 (concluding that the State's delivery of test results to the defendant a half hour before the start of trial was not an unreasonable delay under the circumstances); *State v. Kelly*, 2000 ME 107, ¶ 26 n.11, 752 A.2d 188 (concluding that there was no error when the defendant was aware of the exculpatory evidence before trial).

[¶24] Here, the State did not conceal the evidence, which it provided to Williamson partway through the first day of a two-day trial, soon after the prosecutor had first learned of the investigation concerning the witness. Williamson vaguely argues that the investigative report could contain impeaching information, but there is nothing in the record before us that suggests that the evidence at issue is either exculpatory or impeaching. The investigation of the neighbor was wholly unrelated to the matter before the trial court, and accidentally shooting oneself, without more, does not demonstrate bias, motive to fabricate, personal interest, hostility, or any other

factor affecting credibility.[6]    Therefore, because the State disclosed the evidence to Williamson, and the information was not favorable to him pursuant to *Brady*, Williamson's right to due process was not violated.

The entry is:

Judgment affirmed.

---

Jeremy Pratt, Esq. and Ellen Simmons, Esq., Camden, for appellant Joshua Williamson

Maeghan Maloney, District Attorney, and Alisa Ross, Asst. Dist. Atty., Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2015-1241
FOR CLERK REFERENCE ONLY

---

[6] Williamson's contention that the late disclosure left him with no recourse is unpersuasive where he did not request a continuance, an in camera review, a mistrial, or any other form of relief. *See State v. Gould*, 2012 ME 60, ¶ 27, 43 A.3d 952; *State v. Dube*, 478 A.2d 1138, 1142 (Me. 1984).